## NIGRO v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit.
July 28, 1925.)

No. 6696.

**1. Criminal law �găm1129(3)—General assignments of error not noticed, unless prejudicial error patent on record.**

Where assignments of error in charge were extremely general, court would be justified in refusing to notice them, were there not plain prejudicial errors on face of record.

**2. Poisons ⟩9—Charge on object of Anti-Narcotic Law held erroneous.**

Since the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q) was valid as a revenue measure only, it was prejudicial error to charge that as a secondary proposition its design and object was to restrict and prohibit promiscuous traffic in narcotic drugs, and that in enacting a law for taxing drugs, or traffic therein Congress had provided that no person should deal in such drugs.

**3. Indictment and information ⟩176—Prosecution not bound to establish offense as of particular date charged in indictment.**

When, in indictment, defendant is charged with commission of an offense as of a particular date, prosecution is not bound to establish offense as of that date.

**4. Indictment and information ⟩176—If date specified in indictment erroneous, offense may be proved at time it was in fact committed, if within limitation.**

If date specified in indictment is erroneous one, prosecution will not be precluded from proving offense at time in fact it was committed, if at any time within statutory period of limitation.

**5. Criminal law ⟩1172(1)—Statement of court limiting evidence to prove that defendant was a dealer held not to cure error in charge that, if defendant had possession of drugs within three years, jury should find him guilty.**

Where prosecution under Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q) laid crime as of named date, and introduced major part of its evidence as to transaction on that date, but introduced evidence showing possession of drugs prior to date charged, statement by court, in overruling objection to testimony, that it was competent to show defendant was a dealer, did not cure error in charge that, if defendant had possession of drugs at any time within three years, jury should find him guilty.

**6. Poisons ⟩9—Charge authorizing conviction if defendant made sale of narcotic drug on day charged, or any other day within three years, held erroneous.**

In prosecution under Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q) for sale of opium and morphine, charge that, if jury find defendant was in possession of narcotics mentioned within three years before return of indictment, they should convict, was calculated to send jury too far afield, in view of fact that prosecution had selected and stood on particular transaction, as to which there was no uncertainty as to time and quantity.

Stone, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Missouri; Albert L. Reeves, Judge.

Frank Nigro was convicted of violation of the Harrison Anti-Narcotic Act, and he brings error. Reversed and remanded for new trial.

William Alford, Fred W. Coon, and Walter A. Raymond, all of Kansas City, Mo., for plaintiff in error.

Charles C. Madison, U. S. Atty., and S. M. Carmean and C. S. Walden, Sp. Asst. U. S. Attys., all of Kansas City, Mo., for the United States.

Before STONE and LEWIS, Circuit Judges, and SCOTT, District Judge.

SCOTT, District Judge. Plaintiff in error, Frank Nigro, hereinafter referred to as defendant, was indicted for violation of the Harrison Anti-Narcotic Act (Comp. St. §§ 6287g–6287q) in three counts. The charge as stated in each of the three counts had reference to the same general transaction, and was alleged to have occurred on or about the 23d day of December, 1923, at Kansas City, Mo. The first count charged in substance that the defendant, at the time and place stated, being a dealer in opium and its derivatives and coca leaves and their derivatives, and a person required by the laws of the United States to register as such dealer did unlawfully and feloniously possess for sale and distribution one pound of gum opium and four ounces of morphine without having registered as a dealer and paid the special tax. The second count charges in substance that the defendant at the time and place stated, being a person who had not registered as provided by the act referred to, and who had not paid the special tax, did unlawfully and feloniously sell to one McCarthy one pound of gum opium and four ounces of morphine, not in pursuance of a written order as required by said act. The third count charges in substance that the defendant, at the time and place stated, did unlawfully and feloniously purchase one pound of gum opium and four ounces of morphine, the same not being within or from the original stamped package, in violation of said act.

The defendant was tried and convicted upon all three counts, and sentenced upon the first count to serve five years in the federal

prison at Leavenworth, Kan., and on the second count a like sentence to begin at the expiration of the term of the first, and upon the third count a like sentence to run concurrently with the sentence under the second count. Defendant brings the case here upon writ of error.

It is apparent from an examination of the record that the verdict of the jury rests in substantial entirety upon the testimony of three witnesses, Franklin McCarthy, Fred Robertson, and W. O. McDonald. McCarthy was about 23 years of age. He had no permanent place of abode, nor had he any real occupation. He testified that he was a flier by occupation. His testimony showed that he had been in the late war, and that since that time to some extent he had engaged in aeroplane flights. For a month or two he had been a cook on a railroad. He had been in Chicago, Canada, and Mexico, but had remained in no one place for any considerable length of time, nor had he engaged in any particular occupation for any considerable length of time. Among his divers brief occupations he testifies that he had been in the employ of some narcotic society for the suppression of narcotics. His mother resided in Kansas, and about the 12th or 14th of December, 1923, he came to Kansas City, Mo., to sojourn. He testified that his mother was furnishing his expense money; that about December 19th he made some arrangements for employment with the government narcotic agents at Kansas City; that while in a soft drink parlor, at about that time, for the purpose of getting moonshine whisky to drink, he met one Keating; that on the 19th of December, while he was with Keating, they met, and Keating talked to a man named Davis; that he (McCarthy) had arranged with Keating as an agent to assist him in buying five pounds of opium; that he and Keating went to the Hotel Cotter in Kansas City, and from there to the New Midland Hotel on East Ninth street, Kansas City; that while standing in front of the New Midland Hotel, on December 19th, the defendant, Nigro, approached and asked Keating if he had been looking for him and what he wanted; that Keating replied, "Yes, we were looking for you, but we are dealing now with this party," referring to one Davis; that defendant said, "Well, that is just as well as dealing with me," and stepped back in front of the hotel.

McCarthy testifies that no further conversation was had between Keating and defendant, or in his presence, at that time.

That he returned to the Sexton Hotel, where he was staying; that his room was No. 311 at that hotel; that the next time he heard from the defendant was the following morning, when the telephone in his room rang; he was asleep, and, "being somewhat drowsy, I am not certain what the conversation was that followed, for the reason that I interrupted the man, whom I assume was Nigro." The defendant here objected, and the court announced that the conversation would be stricken if it was not connected. The witness then was asked whether he saw defendant the next day after the telephone conversation, and in reply testified that on the following morning he saw the defendant near a shoe-shining parlor a half a block from the New Midland Hotel; that, not knowing Nigro for a certainty, he stopped and asked if he had seen Frank Nigro; that the defendant in substance replied that he was Frank Nigro, whereupon witness said, "You remember me," and the defendant said, "I do," and witness said, "Do you remember me being here with Keating," and that defendant replied, "Yes." Witness then said, "I want to leave town at 5:30 this evening; did you call me up yesterday morning?" and that defendant replied, "Yes." Then the court permitted the witness to testify about the telephone conversation as follows: "The only thing I can remember was some one asked if that was 311, and I said it was, and he said, 'Well, say, I can't deliver that stuff,' and right there I interrupted him to say, 'Well, I can't take it to-day; I can't be bothered with it, because I can't leave town.' He said, 'All right,' and I hung up the receiver."

McCarthy testified that he saw the government officers every day, and that they were in his room, 311 Sexton Hotel, when he started hunting for Nigro. The witness then stated what occurred at the shoe-shining parlor as follows: "When I found him, as I say, I asked him if it were he, and he said it was, and I told him that the man Keating, who had been acting in a sort of a way, on my instance, as an agent, had gone to a show, and I could not page him in the show, and I could not locate him, and I desired to leave town about 5:30 or 6 o'clock, and asked him if I could make this purchase direct from him. He said I could; that the stuff had been put away for me, had been wrapped up in a package. They were a pound of opium and four ounces of morphine. He said he had put it away, and he would have a little difficulty in locating it, but he would

try to get it to me by 5:30. That is all the conversation there was." The witness further testified: "That evening, at about 5:15, Roberts, McDonald, and myself were in the room, and the phone rang. I answered it. The party said, 'Is this 311?' I said, 'Yes.' He said, 'This is Frank.' Immediately Officer McDonald, who was standing right at my elbow, reached for the receiver, and I pulled it around so that he might hear. This party said, 'This is Frank,' to which I replied, 'Yes, Frankie,' and he said, 'Can't deliver that stuff now, have to deliver it later.' I said, 'What time shall I expect it?' and he said—I said, 'I would like to get a 10 o'clock train to Chicago.' He said: 'I will try to deliver it by 9:30. It will give you a half hour to get away from the hotel to the Union Station.' That is what I told him I wanted, and that is what he agreed to. That ended that conversation. * * * He said, as I remember, he had the four packages, but could not deliver, was trying to get ahold— and there I interrupted him, and I said, 'The aeroplane motor.'"

McCarthy then testified that after the conversation Keating rang up and said he was in the lobby; the narcotic agents remained in witness' room; that about 7 o'clock Keating and the witness Robertson came to the room, bringing one pound of gum opium and four ounces of morphine; that McDonald, narcotic agent, immediately went down on the street and soon returned with the defendant, Nigro, under arrest.

The witness Robertson was an addict, and had been convicted of a violation of the anti-narcotic law; had been in jail in Kansas as a vagrant, and had pleaded guilty to the charge of larceny from the person in Oklahoma. He testified that on the evening of December 23d he was on the street with one Hall, and that they were going east on Ninth street about 8:30 in the evening; that he saw Nigro coming down the street in a Cadillac car; that Nigro stopped and called him and Hall over to the car; that there was a fellow in the car with Nigro by the name of Mulhoon; that Nigro asked him (Robertson) and Hall if they would go with Mulhoon and bring some stuff over to him at the Majestic Hotel, and that he would give them $10 apiece to deliver this stuff to him in front of the Majestic hotel; that they agreed to do so, Mulhoon got out of the car and went with him (Robertson) and Hall to the Stratford Hotel, and that Mulhoon there handed him (Robertson) the four ounces of morphine and one pound of opium; that Robertson put them in his pockets, and he

and Hall started out to deliver it to Nigro in front of the Majestic Hotel; that they went there in a car which they hired; that Nigro was in front of the hotel with Keating.

Robertson was then asked if he had a conversation there with Nigro. He answered: "My part of the bargain was to take it to the Majestic Hotel, and he was to receive it in front of the hotel, and the fellow who I afterwards learned was Keating was standing there, and I got out of the car, and I was going to give it to Nigro, and Nigro said, 'Take it.' Keating said, 'I am the night clerk in the hotel.' He said, 'They are likely to see me take it; you take it to my room.' So I started to go in the Majestic Hotel in company with Keating. He told me he was the night clerk there. Instead of that he called me back and said, 'Take it to the Sexton Hotel.' So I naturally thought it would be all right, being Frank told me to; so I walked around to the Sexton Hotel with Keating. I still had the narcotics in my pocket and the hop in my hand, and we walked around to the Sexton Hotel, and there was a lot of city detectives around there; so Keating said: 'Just walk real fast, and get in the elevator, and we'll go to the third floor.' We got in the elevator, and we got off at the third floor, and back in the hall the fellow by the name of McCarthy was standing in the door, and he motioned this way, and I made the remark to Keating, I said, 'Who is this man?' and he said, 'That's my partner; that's all right.' So we walked on back and went in there, and I set the narcotics down on the table, and Mr. Roberts there and Mr. McDonald just came out of the closet and placed us under arrest, while Mr. McDonald, I think it was, rushed out of the room, and in a few minutes he came back, bringing Nigro."

Robertson further testified that he did not know who was to receive the money when the morphine and opium were delivered; that he was not to receive it and that nothing was ever said to him on that subject; that Nigro at no time was in possession of the narcotics, so far as he knew. He testified that he had sold narcotic drugs, and over the objection of defendant's counsel was permitted to testify that he had purchased drugs on prior occasions, as many as 15 or 16 times, from Nigro; the last purchase being probably about three weeks before December 23d. He was jointly indicted in this case with Nigro, and testified that he had agreed with Nigro to assume full responsibility for the charges made against them and

plead guilty, on the representation of the defendant, Nigro, that he would get only two years; that he afterwards found out he would get four or five years. But he did plead guilty.

Although it appears that Keating was in the courtroom during the trial, he was not called as a witness to corroborate Robertson's statements. Nigro, as a witness on his behalf, testified that the morphine and opium delivered by Robertson to McCarthy was never his; that he never saw it until he was taken into room 311 at the Sexton Hotel on the night of December 23d by McDonald; that he never saw McCarthy before he was taken to that room; that he had never had any conversation at any time with McCarthy; that he never called McCarthy up over the telephone, that he did not even know the telephone number at the hotel, and that he was never in room 311 at the Sexton Hotel until taken there by McDonald; that he had never had any conversation with McCarthy and Keating, that he never talked to Robertson about these narcotics, that he had not seen Robertson on December 23d until he was taken to room 311, and that he had never sold Robertson any drugs; that he was at home on the evening of December 23d, and while he and his wife were eating dinner, about 6 o'clock, he was called by the telephone; that the party calling him represented that he was McDonald, and that he then went to the Baltimore Hotel, at Twelfth and Baltimore, arriving there at about 7 o'clock, pursuant to the request that he come there, made over the telephone; that the party who represented himself to be McDonald over the telephone said he wanted to see Nigro at that place on a business matter; that after he got to Twelfth and Baltimore he saw McDonald coming across the street from the Sexton Hotel; that McDonald grabbed him, took him to room 311 in the Sexton Hotel, and there said, "Here it is; we have got your stuff here."

We quote the record on that part of Robertson's testimony which as admitted over objection, and to which rulings exception was saved.

"Q. (by counsel for the government) Mr. Robertson, on your cross-examination I believe you stated that you had sold narcotic drugs for some time here in Kansas City, Mo? A. Yes, sir.

"Q. In what quantities did you generally sell these drugs? A. Well, in case I ran across it—I never did own any drugs myself, but as I said I would go between a lot of times.

"Q. From whom did you purchase your drugs?

"By Mr. Alford: I object to that, on the ground it broadens the issues of the indictment; it is incompetent, irrelevant, and immaterial, and does not tend to prove or disprove any issues in the case.

"By the Court: Objection overruled, except as to any purchase he may have made from anybody else except the defendant.

"By Mr. Coon: If the court please, it could not go to the defendant only as a question of identification. There is no question of identification here. That is the only purpose it could be used for.

"By the Court: It can be used for the purpose of showing he was a dealer, and if the purchase was made any time within three years before the filing of the indictment. He may answer the question. (To which ruling and action of the court the defendant by counsel then and there duly excepted, and still excepts.)

"A. Well, I had purchased them from Frank before.

"By Mr. Coon: If the court please, I move that answer be stricken out, and the jury be instructed to disregard it, because he has not fixed any time or any place.

"By the Court: Objection overruled. Motion is denied. (To which ruling and action of the court the defendant by counsel then and there duly excepted, and still excepts.)

"Q. Frank who? Who do you mean when you refer to Frank? A. Mr. Nigro.

"Q. The defendant in this case here? A. Yes.

"Q. Can you state, Mr. Robertson, the approximate amount of narcotics you have purchased from Frank Nigro during the past three years? A. Well that would be just guesswork.

"Q. Can you state the amount? A. Maybe 15 or 20 times.

"By Mr. Alford: I object to that as not being responsive to the question. He has now stated the number of times, and not the amount. Move the answer be stricken out.

"By the Court: Sustained.

"Q. Can you state the approximate amount you purchased at any one of the 15 times?

"By Mr. Coon: We object to that, if the court please, for the reason that we are entitled to know the time and place when he made his purchase, and how much he bought each time.

"By the Court: You can bring that out on cross-examination. I understand this is for the purpose of showing he was a deal-

er in habit-forming drugs, as alleged in the indictment. He may answer.

"By Mr. Alford: If the court please, did you say I brought this out on cross-examination?

"By the Court: No; I said he is using this for the purpose of showing he is a dealer, as alleged in the indictment; that is, I assume that is the object. It will be limited to that purpose anyway. (To which ruling and action of the court the defendant by counsel then and there duly excepted, and still excepts.)

"A. Well, probably, I never bought over three ounces from him, that I can remember of.

"Q. I did not understand you? A. I never bought over three ounces from him at one time, that I can remember.

"Q. What was the smallest amount of narcotics you ever purchased at one time from Mr. Frank Nigro? A. One ounce.

"Q. Can you give the approximate date of the last purchase of narcotic drugs you made from Frank Nigro? A. Well approximately—no; I could not say just what date.

"Q. I say can you approximate the date? A. Probably—

"By Mr. Alford (interrupting): The witness has already answered the question, and I object to counsel leading him as to a material allegation in the indictment.

"By the Court: He is asking for an approximate date.

"By Mr. Alford: You were asked the date before.

"By the Court: He may tell, if he knows, the approximate date. (To which ruling and action of the court the defendant by counsel then and there duly excepted, and still excepts.)

"A. Probably three weeks before. It had probably been that long.

"Q. Three weeks before what time? A. Before the 23d; before this deal came up; probably, before I bought any from him. I am not sure of that. It is just approximately.

"Q. Mr. Robertson, before you entered a plea of guilty in this court, did you ever have any conversation with the defendant Frank Nigro? A. Yes, sir.

"Q. Between the time that you entered your plea of guilty in this court and the 23d of December? A. Yes, sir."

The witness W. O. McDonald testified that he was a special officer of the Law Enforcement Association in Kansas City and vicinity, and had acted as such for about three years; that he knew defendant Frank Nigro; that the first time he met him, to know him real well, was in the Antoinette Apartments on August 29, 1923. The witness was asked the following questions by the prosecuting attorney, and the following proceedings occurred on the trial:

"Q. What took place at that time (at the Antoinette Apartments, August 29, 1923)?

"Mr. Coon: If the court please, I object to what took place at that time. His purpose was trying to show that this witness knows and is acquainted with Frank Nigro. I object to him going into what happened at different places.

"Mr. Walden: I undertake to show that he was smoking opium.

"The Court: I do not know what answer the witness may make, but, in the event the testimony is not relevant and material to the issues on trial, of course the court will then strike it out.

"Mr. Alford: Then I ask the court to strike out the statement of the assistant district attorney as to what he expected to prove by this witness as to that, and the jury instructed to disregard it.

"Mr. Walden: I wanted to show the relevancy of the question.

"The Court: He may answer the question. (To which ruling and action of the court the defendant by counsel then and there duly excepted, and still excepts.)

"A. Mr. Sheets, narcotic inspector, Mr. Bradshaw, and myself went to the Antoinette Apartments and found Frank Nigro and Hylan Logan smoking opium.

"Mr. Coon: If the court please, that can have no place in the trial of this case at all, and I am going to take the liberty to say that the purpose of the district attorney at this time is to prejudice this jury against the defendant in this case, by having this witness testify to some matters that are entirely incompetent, irrelevant, and immaterial. The primary question was to try to show that this witness is acquainted with the defendant, and you do not have to go into any detail as to what happened at any other place, to show that he has committed other offenses, for that purpose.

"The Court: Objection sustained to that portion of the witness' answer, and, on motion—you made a motion to strike it out?

"Mr. Coon: I made a motion to strike it out.

"The Court: The jury is instructed to disregard that portion of the witness' answer.

"Q. Without reciting or repeating your previous answer, did you find him on that

occasion in possession of any opium, or smoking opium?

"Mr. Alford: I object to that as leading and suggestive.

"Q. What, if anything, did you find, on the occasion of your visit in possession of this defendant?

"The Court: He may answer. (To which ruling and action of the court the defendant by counsel then and there duly excepted, and still excepts.)

"A. He had quite a quantity of smoking opium. I do not remember just the exact amount.

"Mr. Alford: I ask that be stricken out, for the reason it does not tend to prove any issues in this case; incompetent, irrelevant, and immateral; it is an attempt to prejudice and inflame the minds of this jury against this defendant.

"The Court: Objection overruled. The force of the testimony is limited to the allegations of the indictment that he was a dealer in opium.

"Mr. Walden: That is the purpose. (To which ruling and action of the court the defendant by counsel then and there duly excepted, and still excepts.)"

Mr. A. M. Sheets, called for the government, testified that he was a narcotic inspector, and had been for about two years; that on August 29, 1923, he made a search under a warrant of the Antoinette Apartments at Kansas City, Mo.; and in the course of that search broke in the door and found defendant, Nigro, there. At this point Mr. Coon, counsel for defendant, interposed an objection as follows:

"Mr. Coon: If the court please, defendant objects to this testimony, for the reason that I take it that the purpose of the district attorney is to prove a separate and distinct offense, other than that which defendant is charged with in this case, and it could not be relevant for any purpose other than identification, and there is no question about identification of the defendant in this case.

"The Court: Objection overruled.

"Mr. Alford: I wish to supplement that objection by this: That before any evidence can be introduced under this action on the part of the narcotic agents on the 29th day of August, that the search warrant be brought here, showing that the search warrant was to search the room of the defendant Nigro, and that it was his room, or to search his person.

"The Court: Objection overruled. He may answer. (To which ruling and action of

the court the defendant by counsel then and there duly excepted, and still excepts.)

"A. (continuing). We found Mr. Nigro in room 203, and also found a quantity of smoking opium in there. (Jar marked Government Exhibit 7 for identification.)

"Q. I will hand you what is designated as Government Exhibit 7, and ask you to state whether or not you have ever seen this before? A. Yes, sir; I have.

"Q. When and where did you first see it? A. On that night of August 29th, in room 203, Antoinette Apartments.

"Q. Where was it in respect to its position in the room? A. It was on the floor, on a rug.

"Q. Mr. Sheets, in your experience as a narcotic agent, are you able to determine the approximate amount of narcotics or smoking opium that is in this jar? A. Yes, sir.

"Q. Will you examine it, and state to the jury the approximate amount? A. About four ounces.

"Q. What did you next do after finding this jar designated as Government Exhibit 7? A. We searched Mr. Nigro, and he had a key in his possession, which unlocked the door of the room."

Plaintiff in error has filed 18 separate assignments of error. Nearly all of these, however, are so formal and general as to raise no particular question on the record, and many of them are wholly without merit.

[1] The eleventh assignment of error is as follows: "The court erred in his charge to the jury as to the necessary proof required to authorize the conviction of the defendant on the first count of the indictment."

The twelfth assignment of error is the same as the eleventh, except that it applies to the second count of the indictment.

The thirteenth assignment of error is in the following language: "The court erred in his charge to the jury that, if they found the defendant guilty under the first and second counts of the indictment, they must find the defendant guilty under the third count."

The foregoing assignments, as will be observed, are extremely general, and this court might be justified in refusing to notice them, were there not what we conceive to be plain prejudicial errors on the face of the record.

[2] In its charge to the jury the trial court said: "The defendant in this case gentlemen of the jury, stands charged with having violated what is known as the Harrison Anti-Narcotic Law. The Harrison Anti-Narcotic Law, the court should explain to you, is a law enacted by the American Con-

gress, and the purpose of that law is to collect revenue for the government as a primary proposition, and as a secondary proposition the design and object of the law is to restrict, and to prohibit in a measure, the promiscuous traffic in what is known as narcotic drugs in this country. The traffic in narcotic drugs, or habit-forming drugs, has been of such nature that Congress felt the need of a law that would not only aid in gathering revenue from such traffic, but in a suppression of such traffic in so far as it was designed for the purpose solely and alone of feeding the appetite of those who were addicted to the use of such drugs."

And again the court said: "The Congress, in enacting a law for the taxing of such drug, or the traffic therein, and in seeking to limit or restrict such traffic, has provided that no person shall deal in such drugs," etc.

We conceive that part of the court's charge above quoted to be an erroneous statement of the law. The Supreme Court of the United States in Linder v. United States, 45 S. Ct. 446, 69 L. Ed. ——, decided April 13, 1925, said:

"The declared object of the Narcotic Law is to provide revenue, and this court has held that whatever additional moral end it may have in view must 'be reached only through a revenue measure, and within the limits of a revenue measure.' United States v. Jin Fuey Moy, 241 U. S. 394, 402, 36 S. Ct. 658, 60 L. Ed. 1061, Ann. Cas. 1917D, 854. Congress cannot, under the pretext of executing delegated power, pass laws for the accomplishment of objects not intrusted to the federal government. And we accept as established doctrine that any provision of an act of Congress ostensibly enacted under power granted by the Constitution, not naturally and reasonably adapted to the effective exercise of such power, but solely to the achievement of something plainly within power reserved to the states, is invalid and cannot be enforced. [Citing cases.] In the light of these principles, and not forgetting the familiar rule that 'a statute must be construed, if fairly possible, so as to avoid, not only the conclusion that it is unconstitutional, but also grave doubts upon that score,' the provisions of this statute must be interpreted and applied."

It seems to be clearly ruled by the repeated decisions of the Supreme Court that whatever moral effect is attained by prosecutions under the law in question is purely incidental to the declared purpose of the law and the constitutional limitation of the national law-making power. What effect the statement to the jury that the secondary object of the law is to restrict, and prohibit in a measure, traffic in narcotic drugs, may have had upon the jury in the particular case, we cannot tell, and in view of the whole charge of the court it is probably doubtful that it had any controlling effect, and this court would not be in the particular instance inclined to reverse, if there were no other prejudicial errors on the face of the record. We call attention to this part of the charge, and indicate disapproval of such expressions, as cases may frequently arise wherein such expressions might be extremely prejudicial.

The trial court further charged the jury, after summarizing the charge in count 1 of the indictment: "Now, gentlemen, if you shall believe and find from the testimony that the defendant was in possession of one pound of smoking opium and four ounces of morphine, or any other quantity, at any time within three years before the 3d day of January, 1924, the date on which the indictment was filed in the clerk's office, then you will find him guilty under the first count of the indictment."

And, after summarizing the charge in count 2, the trial court further said: "Now, gentlemen, on this charge, if you shall find and believe, from the testimony in this case, that on that day or any other day within three years before the 3d day of January, 1924, the defendant made a sale of one pound of opium and four ounces of morphine, or any other quantity of said drug, to Pat McCarthy, it would be your duty to return a verdict of guilty on the second count of the indictment."

Respecting the third count, the trial court said: "And again, gentlemen, on the third count of the indictment he stands charged with having made a purchase of such drugs on the 23d day of December, 1923. Now, if you shall find and believe, and the court shall say further, that such count of the indictment that such purchase was not made in or from the original stamped package, if you believe and find from the testimony that the defendant did make such purchase of such drug on the 23d day of December, 1923, or at any other time within three years before the 3d day of January, 1924, it would be your duty under the testimony to find him guilty."

And at a later point in the charge, after summing up the testimony, the trial court said: "And I say here and now, gentlemen,

that, if you find the defendant guilty on the first and second counts of the indictment, it would be your duty to go further, and find him guilty on the third count of the indictment."

[3, 4] Now, we are not unmindful of the rule that when, in an indictment, a defendant is charged with the commission of an offense as of a particular date, the prosecution is not bound to establish the offense as of that particular date. It is well settled that, if the date specified in the indictment is an erroneous one, the prosecution will not be precluded from proving the offense at the time it in fact was committed, if at any time within the statutory period of limitation, and in cases such as this three years. We conceive, however, that this rule does not imply that the prosecution may lay the crime in the indictment as of a particular date, and then settle upon and adduce proof with respect to a transaction on or about that particular date, and then claim a conviction upon proof of some acts occurring prior to that date and manifestly not constituting the offense so charged, and which the government has elected to prove.

Now, in this case the jury was in effect told, in respect to count 1, that if the jury should find that the defendant was in possession of any quantity of the narcotics mentioned at any time within the three years before the return of the indictment, that they would find him guilty under that count. And with respect to count 2 the jury was in effect told that if on that date, or any other date within three years before the 3d day of January, 1924, the defendant made a sale of any quantity of said drug to Pat McCarthy, it would be their duty to return a verdict of guilty on the second count of the indictment. And upon the third count the jury was in effect told that, if it should find that the defendant made such purchase on the 23d day of December, 1923, or at any time within three years before the third day of January, 1924, then it would be its duty to find the defendant guilty.

[5] Now, the government in this case without question laid the commission of the crime as of December 23, 1923, and on the trial selected and introduced the major part of its evidence with respect to a transaction which took place on that date. But in the course of the trial the government introduced evidence tending to show the possession by the defendant of narcotics on numerous occasions prior to the date charged in the indictment. It introduced evidence with respect to the possession by the defendant of narcotics in the Antoinette Apartments, and it introduced the testimony of the witness Robertson to show numerous purchases at numerous intervals throughout the three-year period. It is true that the trial court in its instructions limited the jury in its consideration of the transaction at the Antoinette Apartment for the purpose of showing that the defendant was a dealer, but no reference of like character was made in the charge to any of the other transactions respecting which the witness Robertson testified. The court at one point, in overruling the objection to Robertson's testimony, stated that it was competent to show that the defendant was a dealer, "as alleged in the indictment." That ruling did not cure, in our judgment, the error of the court in instructing the jury that, if the jury find that defendant had possession of any quantity of narcotics at any time within three years, they should find him guilty; nor in respect to count 3 in face of the specific instruction that, if the jury should find that the defendant made a purchase at any time within three years, it would be their duty to find him guilty. Under these instructions the jury was at liberty to find, and may have found, verdicts of guilty on those two counts, based on what occurred at the Antoinette Apartment in the preceding August, or on the testimony of Robertson relative to prior transactions which he had with Nigro.

[6] The instruction given with respect to count 2 presents a somewhat more delicate question. In the quoted paragraph of the charge relating to count 2, which charges a sale, the court specifically referred to a sale to Pat McCarthy. Now there was no direct evidence of a sale to Pat McCarthy, unless it be the transaction with respect to which the witnesses McCarthy and Robertson testified. There was no uncertainty as to the time of this particular event, nor as to the quantity of drugs, and yet the court, in referring to the time, says: "Or any other day within three years before the 3d day of January, 1924," and in referring to the quantity it says, "Or any other quantity of said drug." We think these expressions were calculated to send the jury entirely too far afield, in view of the fact that the prosecution had selected and stood upon a particular transaction, with respect to which there was no uncertainty as to time or quantity.

What effect the statement to the jury, that the secondary object of the law is to restrict and prohibit in a measure traffic in narcotic drugs, may have had, one cannot positively know. But to emphasize and to at-

tribute a purpose to the law which the Supreme Court of the United States clearly indicates was beyond the constitutional power of Congress is calculated to be prejudicial. It is calculated to impress the minds of the jurors with a responsibility to a principle not inherent in the legislation, because it implants the thought that court and jury were under a duty to suppress the destructive and universally condemned drug forming habits. Their only duty was to find under appropriate procedure, whether a plainly written statute had been violated, as charged in the indictment. The statute is valid only as a revenue measure, and it is error in law to apply to it any other purpose and assign any other reason for its enforcement.

For the errors pointed out the case must be reversed and remanded for a new trial on all three counts of the indictment. Reversed.

STONE, Circuit Judge, dissents.